```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
JOHN GLOVER,                                                     :
                                                                 :
                            Petitioner,                          :
                                                                 :      25-cv-2470 (LJL)
              -v-                                                :
                                                                 :      MEMORANDUM AND
WARDEN, FEDERAL BUREAU OF PRISONS,                               :           ORDER
                                                                 :
                            Respondents.                         :
                                                                 :
-----------------------------------------------------------------X
```

LEWIS J. LIMAN, United States District Judge:

Petitioner John Glover ("Glover" or "Petitioner"), proceeding *pro se*, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging the Bureau of Prisons' ("BOP") refusal to apply 1,658 days of First Step Act time credits. Dkt. No. 1.

For the following reasons, the petition is denied.

## BACKGROUND

In 2008, Petitioner pleaded guilty in the United States District Court for the District of South Carolina to charges under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(D), and 846 related to his participation in a conspiracy to possess cocaine with intent to distribute. Dkt. No. 8 at 3; *see United States v. Glover*, 8:07-960-JMC-15 (D.S.C) ("*Glover*"). Petitioner posted a bond of $50,000, secured with house arrest and electronic monitoring, *Glover*, Dkt. No. 341, although the monitoring condition was later removed, *Glover*, Dkt. No. 427. Petitioner failed to appear for his sentencing hearing, and a bench warrant was issued for his arrest. *Glover*, Dkt. Nos. 583, 591.

In 2012, Petitioner was arrested on separate drug trafficking charges filed in the State of Virginia. *Glover*, Dkt. No. 1170 at 6. The District Court was notified of the arrest and issued a

writ of habeas corpus ad prosequendum. *Glover*, Dkt. No. 935. On January 29, 2013, the District Court sentenced Petitioner to a term of imprisonment of 360 months, followed by ten years of supervised release. *Id.* at 21. The term of imprisonment was later reduced to 210 months. *Glover*, Dkt. No. 1207. At some point in 2014, the BOP designated Petitioner to FCI Edgefield for service of his federal sentence. Dkt. No. 1 at 1.

On January 30, 2014, a Virginia state court sentenced Petitioner to a term of fifteen years imprisonment, to run concurrently with his federal sentence. *Glover*, Dkt. No. 1053-1. On December 10, 2014, the federal court amended its judgment to reflect the intent that Petitioner's federal sentence run concurrently with his state sentence. *Glover*, Dkt. No. 1055, *id.* On February 5, 2015, the BOP designated the South Carolina Department of Corrections as the facility for service of Petitioner's federal sentence. Dkt. No. 9-2.

At some point prior to October 14, 2016,[1] Petitioner was transferred to a state correctional facility. *Id.*; Dkt. No. 9 ¶ 12; Dkt. No. 9-3. Petitioner remained in state custody from at least October 14, 2016, until he was transferred to the custody of the U.S. Marshals Service on May 22, 2023. Dkt. No. 1 at 7; Dkt. No. 9 ¶ 14. Between June 7, 2023, and July 7, 2023,

---

[1] The timeline of Petitioner's movements prior to 2016 is unclear. Petitioner appears to have been in Virginia custody through at least early 2015. *See Glover*, Dkt. No. 1066 (order of the South Carolina District Court on February 26, 2015, denying "Defendant's request to be removed from the custody of the Virginia Department of Corrections to the Federal Bureau of Prisons"). BOP submits a declaration stating that Petitioner was transferred to state custody on April 14, 2016. Dkt. No. 9 ¶ 12. However, this date does not appear to be supported by the cited record, which lists a transfer on October 14, 2016. *See* Dkt. No. 9-3. In addition, it is not clear where he would have been transferred *from*, because the BOP does not suggest he was ever transferred out of Virginia state custody. Exhibits to Plaintiff's petition provide a possible resolution, stating that he was transferred to federal custody after he was sentenced in Virginia, but he was then transferred back on October 14, 2016. Dkt. No. 1 at 7. The fact that the BOP designated the South Carolina Department of Corrections as the facility for service of Glover's federal sentence on February 5, 2015, while he was apparently in Virginia prison, adds additional uncertainty. Dkt. No. 9-3.

Petitioner was temporarily placed at several federal correctional institutions. Dkt. No. 9 ¶¶ 15–18. On July 2, 2023, Petitioner was transferred to his designated facility, FCI Jesup. *Id.* ¶ 18. On February 20, 2025, Petitioner was transferred to the custody of the New York Residential Reentry Office, and at the time the petition was filed he was incarcerated at the Residential Re-Entry Center in the Bronx, New York. *Id.* ¶ 19; Dkt. No. 1 at 1. Petitioner is currently completing the 120-day RDAP transitional period, which will conclude in June 2025. Dkt. No. 1 at 2. His projected release date is December 17, 2025. Dkt. No. 9 ¶ 21.[2]

Petitioner filed an administrative request to have 1,658 days of credit applied to his sentence under the First Step Act, which was denied on August 8, 2024. Dkt. No. 1 at 2–5. Petitioner filed an administrative appeal on August 11, 2024, but the BOP failed to respond within the allotted time. *Id.* at 2. Petitioner filed a second-level appeal on November 19, 2024, which was denied for lack of evidence that he had filed a first-level appeal. *Id.* Petitioner refiled the second-level appeal on January 20, 2025, and did not receive a response. *Id.* He filed his petition in this court on March 24, 2025. Dkt. No. 1.

## DISCUSSION

"The execution of a federal prisoner's sentence, including . . . computation of a prisoner's sentence by prison officials," is properly challenged by a motion pursuant to 28 U.S.C. § 2241. *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001); *see Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001). The petitioner bears the burden of proving by a preponderance of the evidence that he is being held contrary to law. *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011).

---

[2] Petitioner states that his release date is September 2025. Dkt. No. 1 at 1. However, official BOP records indicate it is December 17, 2025. Dkt. No. 9-3 at 3.

3

The First Step Act of 2018 ("FSA") was passed on December 21, 2018. *See* Pub. L. 115-391, 132 Stat. 1594. The FSA allows an eligible prisoner to earn time credits for "successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(i). Such credits may be applied towards early placement in prerelease custody or transfer to supervised release. *Id.* § 3624(g).

The procedures for earning and applying FSA time credits are laid out in a Final Rule (the "Final Rule") published by the BOP in January of 2022. *See* 87 Fed. Reg. 12, 2705 (January 19, 2022) (codified at 28 C.F.R. §§ 523.40–44, 541.3, 541.7). Under the Final Rule, an "eligible inmate" may receive credits for participation in programs beginning on December 21, 2018, the date the FSA was passed. 28 C.F.R. § 523.42(b). The Final Rule provides that because the relevant placement and tracking mechanisms were not in place until January 14, 2020, eligible inmates would be afforded a "presumption of participation" between December 21, 2018, and January 14, 2020. 87 Fed. Reg. 12, 2708. However, the Final Rule goes on to state that "[i]nmates will not receive credit for any period in which they were . . . temporarily transferred to the custody of another Federal or non-Federal government agency." *Id.* This explicitly includes "transfer to state custody for service of sentence." 28 C.F.R. § 523.41(c).

Petitioner argues that he is entitled to the presumption of participation in FSA programming from December 21, 2018, to July 7, 2023. Dkt. No. 1 at 2. He states that the only reason he was unable to participate in such programming was that he was erroneously transferred to state custody. *Id.* He argues that he was initially designated to a federal facility, FCI Edgefield, and that his transfer out was a mistake because "the federal government retains jurisdiction once asserted, unless lawfully relinquished." *Id.* (citing *Ponzi v. Fessenden*, 258 U.S. 254 (1922); *United States v. Cole*, 416 F.3d 894 (8th Cir. 2005)).

4

However, Petitioner is incorrect that his transfer to state custody was erroneous. Petitioner relies on the doctrine of "primary jurisdiction" or "primary custody," which provides that "between the state and federal sovereigns, primary jurisdiction over a person is generally determined by which one first obtains custody of, or arrests, the person," and "continues until the first sovereign relinquishes its priority." *Cole*, 416 F.3d at 897; *see Taccetta v. Fed. Bureau of Prisons*, 606 F. App'x 661, 663 (3d Cir. 2015). The sovereign with primary jurisdiction has "priority of custody" over an arrestee subject to charges in multiple jurisdictions, meaning that it has the first opportunity to try, sentence, and incarcerate the individual. *Taylor v. Reno*, 164 F.3d 440, 444 n.1 (9th Cir. 1998); *see Elwell v. Fisher*, 716 F.3d 477, 481–82 (8th Cir. 2013). The sovereign with primary jurisdiction may, if it chooses, "loan" the arrestee to another sovereign to be prosecuted pursuant to a writ of habeas corpus ad prosequendum or similar process, but this does not result in a relinquishment of primary jurisdiction and the arrestee will subsequently return to the custody of the first sovereign. *United States v. Smith*, 812 F. Supp. 368, 371 (E.D.N.Y. 1993) (collecting cases); *see also United States v. Mauro*, 436 U.S. 340, 345–65 (1978).

Petitioner suggests that because he originally faced federal charges, the federal court had primary jurisdiction. Dkt. No. 1 at 2. However, "[t]he controlling factor in determining the power to proceed as between two contesting sovereigns is the actual physical custody of the accused." *United States v. Vann*, 207 F. Supp. 108, 111 (E.D.N.Y. 1962). Accordingly, when an arrestee is released on bail or posts bond and is subsequently taken into the physical custody of a separate sovereign, the second sovereign acquires primary jurisdiction. *See Roche v. Sizer*, 675 F.2d 507, 510 (2d Cir. 1982) (finding that "primary jurisdiction over Roche passed to Connecticut when he posted bond on the Federal charges" and was imprisoned on Connecticut

5

charges)³; *Cole*, 416 F.3d at 897 (noting that primary jurisdiction can be relinquished through "release on bail" or "parole"); *Taccetta*, 606 F. App'x at 663–64 ("[T]he federal government obtained primary custody of Taccetta by arresting him in January 1993, but relinquished custody by releasing him on bail. New Jersey then gained primary custody by arresting Taccetta in August 1993, and retained primary custody because he was not released on bail."); *Taylor*, 164 F.3d at 445 ("[T]he federal government relinquished its custody and primary jurisdiction when it released Taylor on his own recognizance."). Here, when Plaintiff posted bond, left the physical custody of the federal government, and entered state custody on unrelated charges, primary jurisdiction passed to the State of Virginia. *See Glover*, Dkt. No. 1178 ("The state authorities retain primary jurisdiction over the prisoner."); *Roche*, 675 F.2d at 510. The federal court recognized this by seeking custody over Petitioner through a writ of habeas corpus ad prosequendum, which maintains primary jurisdiction with the state. *Glover*, Dkt. No. 935; *see Smith*, 812 F. Supp. at 371; *In re Liberatore*, 574 F.2d 78, 89–90 (2d Cir. 1978).

Because the State of Virginia had primary jurisdiction, Petitioner's transfer to a state correctional facility was not mistaken or erroneous. Petitioner was properly returned to Virginia to serve his state sentence. *See Taccetta*, 606 F. App'x at 662 ("[U]nder customary writ practice,

---

³ *Roche* also approvingly describes an unpublished decision affirmed by the Second Circuit without opinion, *Zeldes v. United States*, 636 F.2d 1206 (2d Cir. 1980), in which an individual who "pled guilty to federal charges and was released on bail pending sentencing . . . was arrested on unrelated New York charges and held in New York custody," *Roche*, 675 F.2d at 510. The individual "appeared in federal court pursuant to a writ of habeas corpus ad prosequendum," was sentenced, and "was then returned to a New York facility to await trial on the New York charges." *Id.* The court "found that the federal government had yielded primary jurisdiction because it had allowed petitioner to be imprisoned by New York authorities without challenging their jurisdiction," and also "found the use of the writ of habeas corpus ad prosequendum to obtain petitioner's presence for sentencing to be persuasive" of the fact that primary jurisdiction had passed to the state. *Id.* The facts of *Zeldes* are nearly identical to the current case and compel the same result here.

Taccetta should have been returned to state custody, at the latest, immediately after his federal sentencing."); *Taylor*, 164 F.3d at 445 ("Because the state retained primary jurisdiction, the district court did not have the authority to place Taylor into federal custody for the purpose of commencing his federal sentence.").

The district court provided that Petitioner's federal sentence would run concurrently with his state sentence, and the BOP accordingly designated the location for service of his federal sentence as the state facility. *See* Dkt. No. 9-2.[4] This meant that every day Petitioner spent in state custody also counted as a day spent in federal custody, effectively crediting Petitioner with one day towards his federal sentence for each day in state custody. Even though Petitioner was in the primary custody of the state, federal authorities recognized this as service of his federal sentence.

---

[4] The BOP has the power to designate a state facility or a federal facility as the location for service of a federal sentence. *See* 28 U.S.C. § 3621(b) (allowing the BOP to designate "any available penal or correctional facility that meets minimum standards of heath and habitability . . . whether maintained by the Federal Government or otherwise"); *see Jenkins v. United States*, 246 F.R.D. 138, 142 (E.D.N.Y. 2007) (Weinstein, J.) (stating that the BOP has "unrestricted authority to designate a state institution for concurrent services of federal sentence"). Because the State of Virginia had primary jurisdiction and custody of Petitioner until 2023, Petitioner's BOP designation before that time did not control his actual physical placement. *See Glover*, Dkt. No. 1178. The significance of the designation to a state facility is that it allowed the BOP to count Petitioner as serving his federal sentence in the state facility while he was also serving his state sentence in that facility, fulfilling the sentencing judge's intent that the sentences run concurrently. *See Dutton v. U.S. Att'y Gen.*, 713 F. Supp. 2d 194, 199 (W.D.N.Y. 2010) (noting that in cases involving concurrent sentences, it is not uncommon that "the Bureau of Prisons will designate the State correctional facility as the place for the defendant to serve his Federal sentence"). If Petitioner had been designated to serve his federal sentence at a federal facility, his incarceration at a state facility would not qualify as service of his federal sentence, and his sentences would have effectively run consecutively contrary to the intent of the sentencing judge. *See Cruz v. Bureau of Prisons*, 2013 WL 12177171, at *3 (S.D.N.Y. Mar. 22, 2013) (subsequent history omitted); *Abdul-Malik v. Hawk-Sawyer*, 403 F.3d 72, 76 (2d Cir. 2005).

However, Petitioner was not able to earn time credits towards his federal sentence under the FSA while in the state facility. *See Levine v. Stover*, 2024 WL 1435594, at *2 (D. Conn. Apr. 3, 2024). Relevant regulations clearly state that an otherwise eligible prisoner will not gain credits during "transfer to state custody for service of sentence." 28 C.F.R. § 523.41(c). The Final Rule also makes clear that the presumption of participation for the period between December 21, 2018, and January 14, 2020, does not apply to individuals housed in state facilities. 87 Fed. Reg. 12, 2708. The rule is consistent with the statutory scheme. The FSA bases participation in programs on a "risk and needs assessment" that is administered "not less than annually" and used to assign individuals to appropriate programming. 18 U.S.C. § 3632(a), (d)(5); *see Milchin v. Warden*, 2022 WL 1658836, at *3 (D. Conn. May 25, 2022) ("[A] prisoner may earn time credits only for completing programs to which he has been specifically assigned based on his particular recidivism risk."). The federal government is required to "provide all prisoners with the opportunity to actively participate in evidence-based recidivism reduction programs or productive activities, according to their specific criminogenic needs, throughout their entire term of incarceration." 18 U.S.C. § 3621(h)(6). However, the FSA does not require the states to use or administer a risk and needs assessment or place individuals in appropriate, targeted programming to reduce recidivism. The FSA also does not require the BOP to provide services in state facilities when an individual is serving a concurrent sentence or to track whether participation in programming in such facilities is consistent with the goals of the FSA, even assuming the BOP would have the capabilities to do so. To participate in FSA programming, Petitioner needed to be in a federal facility.

Given that the state had primary jurisdiction, Petitioner cannot argue that the BOP should have kept him in federal custody and given him access to FSA programming. *Taylor*, 164 F.3d

at 445.[5]  The only argument available to Petitioner is that the BOP should have provided FSA credits for participation or presumed participation in non-FSA programming in state facilities. But the FSA does not require the BOP to provide credits for programming that does not follow the FSA.  The FSA clearly and specifically sets out what an individual must do to earn credits. *See* Pub. L. 115-391.  It would be unfair and contrary to the intent of the law to give individuals in the federal system credit only if they follow specific requirements intended to reduce recidivism, but then give individuals in the state system freeform credits for non-FSA activities. Nor would such a result further the intent of the sentencing judge, who, in determining the appropriate length of sentence, would not naturally expect an individual to earn FSA credits while in state custody.  *See Setser v. United States*, 566 U.S. 231, 239 (2012) (emphasizing that the exercise of BOP discretion should not displace judicial sentencing decisions).  The natural impact of the decision to run the sentence concurrently is that the Petitioner receives the benefit of a concurrent sentence instead of, not in addition to, any credits he could receive from participating in programming in federal facilities if he were to serve his sentences consecutively. Petitioner could not earn FSA credits prior to leaving state custody on June 7, 2023.

Petitioner is also not entitled to credits during the time period from June 7, 2023, to July 7, 2023, when he was transferred out of state custody and placed temporarily in several federal institutions before reaching his designated facility, FCI Jesup. Dkt. No. 9 ¶¶ 15–18.  The language of the regulations appears to contemplate that credits will be earned only at the individual's "designated Bureau facility," not during "temporary transfer" or placements

---

[5] The Court does not decide here whether the BOP could properly designate an individual in primary federal custody to a state prison, rather than a federal prison, and thereby deprive him of the opportunity to participate in FSA programming purportedly available to "all prisoners."  18 U.S.C. § 3621(h)(6).

9

"outside the institution." 28 C.F.R. §§ 523.41(c)(4)(ii)–(iii), 523.42(a). And in any case, Petitioner does not allege that had a completed risk assessment at this time or was assigned to or completed any FSA programming. *See Milchin*, 2022 WL 1658836, at *3.[6]

Petitioner raises due process concerns regarding the BOP's failure to respond to his appeals. *See* Dkt. No. 1 at 3. Because this Court has fully reviewed Petitioner's claims on the merits, Petitioner has received appropriate process regardless of any deficiencies in the BOP's evaluation of the same claims.

## CONCLUSION

The petition is DENIED. The Clerk of Court is respectfully directed to close Dkt. No. 1 and to close this case.

SO ORDERED.

Dated: May 14, 2025
New York, New York

LEWIS J. LIMAN
United States District Judge

---

[6] Petitioner states that "[t]he BOP initially calculated 1,658 days of FSA credits," and that denying those credits after they were previously recognized is unlawful. Dkt. No. 1 at 1. However, the BOP has no record of this initial calculation, and it is not mentioned in Petitioners' previous administrative submissions. Dkt. No. 9 ¶ 22; *see* Dkt. No. 1 at 4–23. On the available facts, the Court cannot determine that the initial calculation occurred or, if it occurred, that it would make the current failure to recognize the credits unlawful.

10